May it please the Court, Your Honors. Before we start, I want to make one thing unmistakably clear for the Court and for everyone listening. My clients are not here trying to acquire for purposes of consumption or anything else. Could you bring the microphone closer? Sure. Any fins from a shark that has been finned at sea, this cruel practice of removing the fins at sea and throwing the shark back in the ocean to die is not something that anybody supports, and we're not here asking to consume those fins. What we are asking for is to be able to consume a product that is taken from the sea, a shark, that is finned lawfully on the shore in full compliance with federal law by a federally licensed fisherman who takes those fins and gives them to a federally licensed dealer so that they can circulate in interstate commerce. May I just ask you one question first? Are you sharing time with me? I think the State may. Thank you. But I would like to reserve five minutes, six minutes of my time. Go ahead. I'm sorry. Just try to keep track of it, and if I can, I will also. Thank you. You seem to be arguing that there's a less drastic means by which the State could achieve its objective, and I guess my question is why should we apply less drastic means analysis in this case? What you're saying is they could have passed a different law. The law could say you can't have shark fins except those removed in a different way, but it doesn't say that. Is the State required to achieve its objective in this less restrictive means in the way that you suggest? We are arguing that in connection with our Commerce Clause claim, but when it comes to our preemption claim, there is no question about whether the State could have achieved something in a less restrictive way or what the State interest is. But on the Commerce Clause claim, to answer your question, we are arguing that first of all, this places a substantial burden on commerce. They haven't said that all shark fins coming into the State must have a tag on them saying that they came from a shark. They're not saying they have to be inspected at the border. They're saying we are shutting down this market, and the record shows that my clients here are losing literally millions and tens of millions of dollars every year because shark fins, even lawful ones, can't come into the State. Your clients are all California residents, as I understand the record? They are California businesses. Businesses. Yes. They buy shark fins, and then they resell shark fins, some to California residents and some available out of State. And they buy those shark fins from fishermen in California, and they buy those shark fins from fishermen from sharks that have been taken in Florida in the Atlantic region, and they buy them from international locations, too, once they're processed and enter this country lawfully under inspection by the FDA. There's also no concern here, yes, Your Honor, that there is a far less restrictive means that can address this. Yeah, I understand there may be, but I'm not sure why the State, under any form of analysis that I've seen, is required to adopt the least restrictive means of achieving its objective if it doesn't think it's the most efficient means of achieving them. Well, first of all, it has to have a legitimate local purpose for that law. There has to be some legitimate reason for the law for them to act that way. And then you look and say you have to weigh what the purpose of that is. When it's conservation, that purpose is not legitimate when it comes to the regulation of a federal fishery. The way it works is California has all the control it wants over the first three miles of the ocean off its coast, but California has no control over the federal waters and the exclusive economies Now you're making a preemption argument. We are making both arguments, Your Honor. We have two claims. Well, but certainly the control over the fishery is not a Commerce Clause argument. It's a preemption argument, is it not? Well, except to the extent that does the State of California have a legitimate interest in regulating the waters, the exclusive waters of the federal government, or the exclusive waters of the Indonesian government? I don't believe that's a legitimate local interest for the State. California can't pass minimum wage laws for the fishermen in the federal waters. How can they pass laws that are aimed at an exclusive, where the federal government has exclusive management of those fisheries? What has the State of California told fishermen in federal waters that it may not do? It may catch sharks. They may catch sharks. They may catch sharks. They may even, I think, although it would be in contravention of federal law, take the fins off of those sharks while alive. Because, right? Because at least so far as California California bans that as well, Your Honor. California law doesn't prohibit that. It does, Your Honor. It bans, it bans taking, having a Not in, not in, not in areas where California has no jurisdiction. That's correct. So it doesn't ban it in the federal waters. So what's the conflict between California law and federal law here? The conflict, there are several. First of all, I want you to put yourself in the position of a federally licensed fisherman. A federally licensed fisherman gets a federal license to go out and fish in the EEZ. California can't tell him what to catch or how much to catch or any of that stuff. He comes back to shore with a shark. And he wants to get rid of the shark. He's in the business of fishing. He cuts the fins off the shark, as he's allowed to, because there's a federally licensed dealer that's there ready to buy the shark. California says, you can, wait, you can possess He's allowed to in what sense? He's not allowed to under California law. He can. He can cut them off and even possess them, Your Honor, under their statute. Under California law, he may cut off the fins. Cut off the fins and he may possess them forever and start a collection. As long as he doesn't sell them for his money. As long as he doesn't sell them. Fair enough. Fair enough. But why is that? Why does federal law, why is federal law to the contrary? I don't see any federal law that says Let me finish the conflict. The conflict, Your Honor No, no, let me finish. I mean, this is the way this works. Why is there a conflict with federal law? Because as I understand it, federal law is silent on this issue. Federal law prohibits him from selling a fin if it came from a shark that was unlawfully finned at sea. Federal law gives him a license to sell. He's a commercial fisherman. Tell me where in federal law there is something that says you have, the federal law gives you permission to sell shark fins. The point of the Magnuson-Stevenson Act No, tell me where in the law. Tell me where in the law it says that. To promote commercial fishing and they defined commercial fishing as fishing for the purposes of sale. So you get this from the purpose of the act. No, the definition of what a fisherman is under federal law. So I'm asking again, because this would be an important part of law for me. Tell me where in the statute you see the federal law saying one has permission to sell detached shark fins for commercial purposes. There is no statement that says you are permitted to sell shark fins for commercial purposes. There is not that. There is the fact that we define a commercial fisherman as somebody who catches fish for the purpose of selling them, not for the purposes of arriving on shore and starting a collection in his backyard of dried fins. So the conflict, in your view, is in the definition of fisherman? And it goes further than that. The fisherman is standing there on the dock. He's got a federal regulator over one shoulder saying. But I'm not asking about shoulders for a second. I'm asking where does the law provide? You've given me two answers, I think. One is you think it's in the purpose of the act and in the definition of fisherman. Tell me where else, either in the regs or the law, a fisherman is given express license to sell. Well, there's only one. I'll tell you, there's only one person that can receive from there's only one person that can come ashore with a shark. And that's a federal fisherman. I understand the logic of your argument. I'm asking you a very different question. One person that can receive it, the first receiver of a shark product. So is the answer to my question, there isn't any other place in the law? No. Why do they license a federal dealer? The federal dealer, not the fisherman, Your Honor, the dealer is the first receiver. He and he alone. I can't go down to the dock and take a part of the shark. Only a federally licensed dealer can take it from a federally licensed fisherman. Does he have the right to sell it? Is there some God given right where the government says you have the absolute right? No state can interfere with that? No, I can see that. That's all I was asking. And that's true. But that's not the standard for preemption. That's not the standard for preemption in the Fourth Circuit has not said that the Eleventh Circuit has not said that. Take, for example, in the in the case of city versus city of Charleston, which we cited in our papers, the city of Charleston said you can't land your swordfish in our in our ports. Go to another port. We don't want you bringing swordfish in here. And the court said, said you can't do that. You can't interfere with that. The guy has a right to go get the fish out of the ocean, not to land there on the dock and leave these fins sitting on the dock. Is the only use of a shark, its fins? Is there anything that of course that there is no market for shark except for the fins? There's there's ample market for shark, but there is as much value in some cases in the fins as that. Doesn't that make this different than the case where you say you may not land a sailfish at a port, as opposed to one where you're saying you can land a shark at a port and you can indeed transport the shark to another state. But what you can't do is possess a detached fin in California. That might be true if the Magnuson-Stevens Act did not define fish to include any part of a fish. So the Magnuson-Stevens Act, we cut the heads off of the fish out at sea. But the Magnuson-Stevens Act says the fish or any part of the fish is what's protected. It may not sell that. There are laws that regulate that. And the concern that the court is articulating, well, can't California say we want to just ban the sale of this product here because there's no other regulation of it? The federal government does regulate those fisheries, highly regulates those fisheries, tells you how many you can catch, how many pounds, sets quotas, determines this all in connection with the state itself. They create a fishery management plan. What significance does it have to your preemption or Commerce Clause arguments that the federal government is apparently taking the position that we don't see a conflict? Let me address that, Your Honor. That's a very good question. First of all, the only formal position taken by the federal government is to file an amicus brief in our support saying that there is a conflict, number one. Then the federal government issued in the Federal Register a proposed rulemaking in which they stated that these rules conflict. These state laws impair their ability. Remember, the goal of the Magnuson-Stevens Act is not to reduce the number of sharks taken, to minimize the number of sharks taken. It's to optimize the yield of the fisheries, not just for sharks, but for other fish. Go back to the question I asked. What's the effect of the federal government's current position? The federal government, the only thing in the record and the only aspect of the federal government, because they're not here to disavow their earlier brief, is that there is a letter that is in the record from judicial notice that was written by the assistant administrator of NOAA to the California Department of Fish and Wildlife head saying something quite minimal when you actually look at what it says. It doesn't say, we've analyzed everything and we think that there's no conflict. It simply says, and there's some curious timing about it, Your Honor, because you want to know when that letter was written? That letter was written just before they filed their reply brief on the motion to dismiss. In fact, they asked for an extension of time from counsel to file the reply brief and put it in. But it's a letter. The amicus brief was filed too late, too, so maybe I should ignore both of them. But just let me take the letter on its face and tell me what it means. What the letter says, and it's simply a letter from the administrator who was addressed as Eileen in Mr. Bonham's letter, to the state of California director saying, we confirm two things, that the revenue from the sale of sharks harvested in federal waters off California derives mostly from the sale of meat, not the fins. Big deal, number one. And number two, that says nothing about the sharks that are harvested off the Atlantic coast, which is where most of the sharks that my clients want to eat, where they're where they come from. Thank you, because I was interested in that one statement and I wanted to ask you about it and you focused on it. If most of the revenue from the shark comes from the meat and not the fins, then how does this conflict with the purpose of the purpose of a certain harvest out in the in the Pacific? We don't have any evidence in this record to suggest that this will this will diminish the harvest of sharks that's authorized under the Magnuson Act, do you? Not in the record, your honor, except that there is a recent federal proposed rulemaking in which NOAA says that there are reduced numbers of sharks being taken and the problem that's a problem for them. They've actually issued permits now so that boats can take not thirty three sharks at a time, but up to fifty five sharks at a time. They're proposing to do that because there are too few sharks being taken. There are too few fishermen. They say it's causing harm to fishermen sales because they come back with the fish and half of the value of the shark in some cases they have to leave on the dock. And I ask the court again to put yourself in the position of a federal fisherman because of the United States Supreme Court and National Meat Association versus Harris just a couple of years ago in a nine zero opinion reversed the Ninth Circuit in a case involving something that appeared on its face to be inhumane, which was and it is dragging of a pig to its slaughter because it couldn't walk a non-ambulatory pig. And the Supreme Court looked at that ban and said, look, you've got a ban on sale of the pork that comes out of a non-ambulatory pig. You can't do that because what you are essentially trying to do is control what a slaughterhouse and they said the federal inspector in the slaughterhouse can do what he wants. You are taking away some of his right to do that. And let me just read you the language because it's exactly what your honest question was is. The question is, consider how the state and federal laws address what a slaughterhouse should do with a pig that is non-ambulatory. And that's the same thing I'm trying to put the court in the shoes of. Consider what a fisherman, the situation a fisherman's in. When he has the shark, he cuts the fins off. It doesn't turn into plutonium there, but he can't even give them to a federal dealer. Here's what the court says. The court analyzes the law and I urge that I urge this court to take a look at it. It's National Meat Association versus Harris. It's 132 Supreme Court 965. And at 970, starting at 971, the court says, and I'll just conclude that the state law and the federal law require different things of a slaughterhouse confronted with a delivery truck containing non-ambulatory swine. The former says do not receive or buy them. The latter does not. And that's the problem here. The federal fisherman is not fishing for fun. He's fishing to sell his fish. He has a license to do that. The first receiver is a federally licensed commercial dealer. He has the federal license and a right to receive those fish. And that's what we're going to ask you, because I tried to ask you before and I couldn't. I'm not sure I got I'm not sure I understood your answer. Where in the law, federal law, does the federally licensed right to take the fin off and sell it commercially come from? Is it the places you identified before you keep talking about it? There is no explicit permission to cut a fin off of a shark at shore and sell it. That is the license given to the first receiver doesn't say you may do the following. You may receive any shark products. It doesn't say he's not allowed to receive the fins. It's that right? No, he made the whole point of getting his permit. He may. I'm asking about the law. I'm not asking about your argument. The law is silent on this, is it not? Any first receiver of a shark product must obtain a license. Yes, but the law is silent about what the first receiver may do with the shark. What he may do with it, that's correct. It doesn't it doesn't say he has a God given right to obtain a fin taken from a law. But that's neither did neither did the neither did the law in the National Meat Association versus Harris. There was nothing that said a slaughterhouse, by the way, has the God given right or federally given right to sell a piece of pork. I just want to make sure that as you switched here, I just want to make sure you hadn't found some provision of law that that gave that explicit explicit. Oh, and that's unnecessary, says the Fourth Circuit, the Eleventh Circuit and the Supreme Court, Your Honor. And without I'd like to reserve the balance. We'll give you five. Now, you are sharing your time. I am, Your Honor. How are you dividing? If the court is amenable, I would like to take 15 minutes and save five for Mr. Henry. One more second. Judge Noonan, are you able to hear us? I am. Thank you. Yes, I should have asked at the beginning. Good. Good afternoon and welcome. Thank you. Judge Noonan sound like your ex cathedra today. May it please the court. I'm Alexandra Robert Gordon from the Office of the Supreme Court, and I'm here on behalf of Defendant Appellees Attorney General Harris and Director Bonham. Obviously, we're now here. We're back on the appeal from the granting of our motion to dismiss with prejudice. And that is because plaintiffs have failed to state plausible claims for relief under the Supremacy Clause, the Equal Protection Clause and the Commerce Clause. Did the California law prohibit bringing a shark into California? It does not, Your Honor. Could it? Could it? Could it? Could you, in order to achieve your purpose of the exact purposes of this act, simply say one may never land a shark and bring it into California? If there were a rational basis for doing so, yes, Your Honor. Wouldn't that conflict pretty directly with the Federal Fisheries Act, which encourages people to take sharks? Well, we would have to look to see if there's a specific command in the Magnuson-Stevens Act. I get to make up the hypothetical. Right. Okay. So accepting your hypothetical, yes. If there is a specific command in a fishery management plan or in Federal law, and State law was in conflict or directly contradicted that specific command, it would be preempted. But here, as we've seen, there is no specific command in Federal law that insists that shark fin is allowed to be sold, possessed. If you can't prohibit landing the whole shark and bringing it into California, once the shark has been taken and is on the shore, what's your interest in the fins? Our interest in the fins is that possession and trade and sale of fin is what is driving the practice of finning. And specifically, although there is Federal and State law that has made the practice of finning, so cutting the fin off of a shark and allowing it to bleed to death. The only prohibition is doing it at sea, right? So the Federal prohibition and the State prohibition is doing it at sea and then coming back to California and landing a carcass that has the fin detached. Right. So let's assume they land a carcass that doesn't have the fins taken off. What purpose, what California purpose is served under that circumstance for prohibiting taking the fin off? So the purpose that's served is that we don't want fin in our market because the market for fin is what's driving the practice for finning. I think maybe what you're asking me is if it's legal fin. Sorry? The practice of finning is driving, taking the fins off legally is driving the practice of finning illegally? No, Your Honor. The demand for fin in California is what is driving the practice of finning. And it is true that some fin will enter legally. But unfortunately, it's extremely difficult to keep track of the fin that is entering legally. Once it's been detached, that becomes an enforcement nightmare. And given that we're on rational basis, we don't have to actually take the least restrictive means and figure out a way to enforce as only against illegally obtained fins. So you would have no objection to their landing the entire shark in California and using the fins if you could keep track of it? Well, Your Honor, if we could, if that were, I suppose if that were possible, that would certainly, that would be fine. But unfortunately, it's proven to be an unworkable scheme. And California, in its wisdom, has taken How do we know that at the stage of a motion to dismiss? Sorry? How do we know that this enforcement problem is so great at the stage of a motion to dismiss? Well, I suppose we don't, since there are no allegations in the complaint that actually address the issue and suggest sort of why other means of finning would be equally as effective as the solution that California has adopted. What if they would? What if the records show that they would? Would we then have a preemption or interstate commerce problem? In other words, what if the other side could prove? I think it'd be very difficult. But they could prove that this method of regulation, which is to say, we only allow fins in California taken off dead sharks on shore, were shown to be as effective, as effective in protecting sharks as another method. Would you then be able to, would you then be able to have the current law? Yes, we would, Your Honor. Why? Because, so as to the preemption claim, because there's still absolutely nothing in federal law with which our law conflicts. There is no command to allow even a legally obtained fin. And that is what is going to determine whether or not there's conflict of preemption. You're in effect saying, as a matter of due process, we can have a law we have now because it's not irrational. And then if you turn to preemption or commerce, there's nothing out there that prevents us from it. Is that what you're saying? Yes. And also with respect to the Commerce Clause, because it's not doing anything impermissible under the Commerce Clause. It's not an undue burden or substantial burden. It's not regulating extraterritorially. What's the extent of it? What's the extraterritorial reach of the Commerce Clause? Let's assume that, I mean, we've got a bunch of cases, and I think we're still struggling over one. What is the proper test for when a state action violates the Commerce Clause because of its extraterritorial effects? Well, so the proper test would be whether the state regulation directly controls, with no nexus to the regulating state, so directly controls, either sort of by its terms or in practical effect, commerce that is happening wholly out of state. That cannot be the case here, where all California is doing is regulating its own market. The shark fin prohibition is entirely indifferent to interstate commerce. California does not care what the price of shark fin is elsewhere or the mode of production is elsewhere. California only cares that there is no shark fin in California. What if the record showed that, realistically, because California is an enormous shoreline, that sharks really were only brought into the western part of the country through California and that their strophe price is way, way up and shark fin price is way, way up in the rest of the country? Would that make any difference? It would not, because there is a difference between a regulation that may have an effect on commerce, such as increasing the price, and the court has said this in its Rocky Mountain case and in other cases as well, that merely having an effect on something like price is very different than directly controlling commerce. So address, because I don't think I've got a clear picture of it before, the proposed regulations that counsel talks about. What do they do and why should we pay attention to them or not? I'm sorry, I don't know specifically. Your opposing counsel talked about proposed regulations that were out there trying to encourage taking of more sharks. And I'm not sure I was familiar with them. Are you familiar with them? I am not familiar with any proposed regulations for the taking of more sharks. I heard opposing counsel reference a proposed rulemaking. Rulemaking, I'm sorry. Yes. So I'm happy to address that. So the federal government did put out maybe a little less than two years ago a proposed rulemaking suggesting mostly that to the extent that state laws banning shark fin conflict with federal law, that they would be preempted. It's a fairly tautological statement. That rule has never been adopted. It's just sort of out there, but it has never become a formal rule. As your honors may remember, shortly before oral arguments on the denial from the preliminary injunction, the federal government also submitted a brief making that same argument. Right. I was trying to get the timing of this down. Did that proposed rulemaking precede the government's proposed amicus last time? It did. And has the rulemaking preceded in any way? No, it has not that I'm aware of, your honor. So it has never been adopted. And after consultation with the state of California and a fairly lengthy consultation process beginning very soon, beginning on September 6, so right after our oral argument the last time, California and the federal government began to consult about the interplay of the federal and state statutes. And based on that consultation, it is the opinion of the federal government that there is no conflict, in fact, between the two schemes. Should we ask the federal government to express that position formally? Should we invite them to submit a brief as amicus curiae? It's a little bit strange. They tried to come in last time to submit a brief. We wouldn't let them. Now there's no brief, but they have a letter. Should we formally ask them to submit a position? No, your honor. I think that what they've said is good enough, but I also think that the court can easily make this determination, frankly, without their opinion. Would you be satisfied if we disregarded that letter? We certainly could disregard that letter, although it is properly judicially noticeable. And in fact, you did allow their brief last time. I don't know how much weight you gave to it, but they were allowed to file it. I think you're probably right. We took it, but told them it was late, and we probably wouldn't pay much attention to it. What effect does the management plan have on this issue of preemptions? I'm sorry? The management plan, what effect does it have on preemptions? Well, it has none, because there's no fishery management plan that actually says anything requiring shark death. How do we know that? Well, there's no allegation that there is a fishery management plan, and I have to believe counsel would have brought one to our attention if such a thing existed. I have certainly never seen one. The fact is that federal law is not in conflict, and the notion that's- I thought there was a management plan that included sharks. It may include sharks, your honor, but there's nothing in that management plan that says anything about specifically allowing the sale of fin. Well, no, but it may say something about encouraging fishing of sharks. It may, your honor, but that wouldn't make any difference, because that wouldn't be a conflict of the requisite magnitude to displace the presumption against preemption. And here's why. So there is a difference between a specific command in federal law or in a fishery management plan that says, you have to be able to sell shark fin. Or even, I mean, we don't even know. There's no allegation of what this number of sharks that- Well, no, but if it would impair the selling of sharks, and the plan were designed to increase the selling of sharks, that wouldn't be preemption? I don't believe that it would be. First of all, there is nothing in this complaint or in the record that tells us how many sharks would be an ideal number to hit. Second of all, there's certainly no specific command. There is such a thing as summary judgment also. I mean, you don't have to try the entire case in a complaint. No, your honor, but they do have to allege it adequately. They do have to state plausible claims, and they haven't done so here. And they won't be able to, because there is no conflict. There's a difference between a state law that may have an ancillary effect on things that are happening in the exclusive economic zone and a state law that is directly in contravention of what the federal government has said in the exclusive economic zone. Our law doesn't regulate anything happening in the exclusive economic zone. It regulates California's market, and that is it. So there's regulate, as your opposing counsel points out, sale of the product, how one sells the product once it reaches the California shore. Does that conflict with the federal? No, it does not, because there is nothing. The federal government has a lot of authority over what goes on, fishing, landing, gear types and limits, duration of fishing. I'm going to go back to what Judge Hurwitz asked earlier. If you had all those things, and then you said, but you can't sell this fish anywhere in the United States. Each state did that. Or even just the major states said, that's fine. Federal government says you can fish, you can land, you can do all of that. And then the state says, but you can't sell it. That wouldn't create an issue? It would not, Your Honor, because there's no. Would that be the South Carolina case? No, actually. The South Carolina case is about what is going on within the exclusive economic zone. It is not about sale. It is about a fishery management regulation. There is no federal power over the sale of fish, or the sale of a fish part. That is sort of control over state's market for products, food products in particular, is an area of traditional state domain, not federal. So no, it doesn't matter that it might have an impact. Could the state of Illinois say, no cod may be sold in this state? Assuming that it meant rational basis. Yes. Yes. Too many people are eating cod, and we don't want to want cod sold in Massachusetts. It's your hypothetical, Your Honor. So I don't know exactly what facts you're including, but yes, theoretically, it could. No, because you're saying it doesn't matter. There's no federal law that mandates that anybody be given the right to sell the product. That is correct. But sure, at some point, wouldn't that interfere with a management plan? It could, but it is not doing so here, and there's no allegation that it is doing so here. So your basis for asking for the motion to dismiss, as far as preemption, is that there's no pleading that the California statute has any adverse, there's an adverse effect because of the California statute on the management plan. There's no such allegation. Well, that, Your Honor, and so that preemption is going to fail as a matter of law because there is nothing that the shark fin prohibition could conflict with in federal law, and then it's also going to fail as a matter of fact. It's not going to conflict with. Let's say federal law and a management plan said we want to have 50,000 sharks caught per year, and the California plan meant that the catching of sharks would decrease from 50,000 to 20,000 because they were not as marketable. And you say, well, it doesn't matter. We don't care whether they can sell the fish they catch. We don't have any effect. If those are the facts, would that be true that you wouldn't be having any effect of warranting preemption? Well, Your Honor, we might be having an effect, but effect doesn't get you to preemption. Conflict gets you to preemption. So there are all kinds of state regulations that have effects on what's going on in the exclusive economic zone. We tax diesel fuel. That's going to be a much bigger driver of fishing behavior, actually, probably, than the shark fin ban. But that is still permissible. But let's go back. I want to ask Judge Reinhart's question a slightly different way. I may assume that we have no conflict here between any federal law, direct conflict between the wording of any federal law and a state law. Is there a point in time when the state law can conflict with the purpose of the federal law sufficiently for there to be preemption? Let me make you less nervous. We're going to give your co-counselor a full five minutes. I guess I have no poker face, if you can tell what it is that I'm thinking. Thank you. I'm sorry. I guess what my question is, is there a point in time where California's law practically conflicts with federal law, even if it doesn't formally conflict with federal law? Sort of the same question Judge Reinhart asked. If California is, as we are always told, one of the major markets in the United States for everything, and you drive down the market for shark, at some point, will that conflict with the federal management plan? Again, there is no federal management plan that is setting forth anything that it could conflict with. There's no management plan that they allege it conflicts with. Right. And there is none in the record that we are aware of. So theoretically, yes, but not under the state of facts and law that we have here. Thank you. May it please the court. My name is Ralph Henry, and I represent the Intervenors Humane Society of the United States, Monterey Bay Aquarium Foundation, and Asian Pacific Americans for Ocean Harmony Alliance. I want to pick right up on that last point, actually. That is that it may be true, as a matter of fact, that at some point California's law prohibiting the sale of a fish part or product could have an impact that would reduce the amount of fish coming out of the ocean, which is really what the federal fisheries law is about. It's not about sale, and I'll get to that in a second. But we don't, not only do we not have those facts here, but there are a whole host of hypotheticals that could come into play if we started down that route. Do we have those allegations here? We're not dealing with facts, we're dealing with a complaint. We don't. What we have are conclusory assertions and assumptions that if you ban the sale, you will not be able to remove as many fish from the sea. But that's an assumption that is devoid of any factual support. Why isn't there a pleading that that will be the effect? Well, they have said that that will be the effect, but there needs to be factual support for that. Let me play it out this way. In the complaint? In the complaint, all they say are. No, but why does there need to be factual support? We're not at summary judgment, as Judge Reinhart said. Why does there have to be factual support in the complaint? It does strike me that it's plausible that if you reduce the demand for part of the shark, you may reduce the demand for the number of sharks. The facts on the face of the complaint need to provide plausibility for the legal claim. Not it's plausible that a particular factual circumstance could possibly play out, but that the facts as pled could give rise to a cognizable legal claim. Well, but that's why Judge Reinhart's asking the question, and I'm trying to rephrase it a little bit. What he's saying is, which is what I'm saying. I don't know what Judge Reinhart's saying. Tell me. What he's saying is, is that if you have a situation where the federal plan calls for the taking of a certain amount of sharks, and I'm not sure that's alleged here, and you have a state regulation which plausibly, we would think, would reduce the number of sharks, the demand for sharks, and therefore might reduce the number of sharks taken, isn't that enough to get past a motion to dismiss? Maybe. It's the we think that is the assumption right there in that last statement. And that is, what happens if, by virtue of this state law, the price for fins, which are much more valuable than the meat, goes down, all right? And so the abhorrent, cruel practice of finning, live finning, tossing sharks overboard to drown to death, be eaten alive, starts to be reduced wherever that is practiced. But because the demand for fins maybe stays so high that it drives the price for shark meat up so that these fishermen are willing to put whole sharks and weigh their boats down with whole sharks as opposed to just the fin, and that's obviously the impetus for live finning, onto their shark. It could be the case that the California law actually leads to more efficient shark fishing. It's that assumption right there of the, we think. Aren't those facts that you would try in starting a motion for some reason? If it was alleged, but none of that is alleged here. All right, so we're back to that same thing. You said that they're not alleging that there's preemption because of the Management Act. Well, they do allege that there's preemption because of the objectives of the Magnuson Act, but they assume that the objectives are maximizing profitability from all parts and products of a fish. And that is by no means the objective of the Magnuson Act. Is there a management plan in place here? There are management plans for a number of sharks in place around the country. None of them has anything, says anything about- There are management plans in place that talk about how many sharks you want to encourage people to take, are there not? That's right, but this happens all the time. The federal government regulates the import and interstate commerce of all kinds of wildlife species, elephants to domestic- So let me go back to my question, because I'm not sure, why isn't it, it may turn out that they can't prove it, but why isn't it plausible to think that reducing the demand for a highly sought after part of the shark will reduce the number of sharks taken? I think that you can't just state that conclusory allegation as a matter, under this circuit's pleading law, that conclusory allegation without some foundational support pointed to in the complaint. That's like saying, why isn't it plausible that a group of surfers will all come in and into the state all of a sudden and take all of the shark fins out of the state and then that would solve it? Or that aliens would come down? You can't just sort of hypothesize. The problem is it seems a little logical that not allowing the sale of a particular part of product might lead to reduced numbers of fish being pulled out of the sea. It does seem logical. But I think they're all kind of, that's my point of like, it could drive the price of the whole meat of the shark. But if it seems logical, is that enough to get past the Iqbal standard? No, because there needs to be- Iqbal just says plausible. No, because, but the question about plausibility is not a plausible factual scenario. It's whether the facts pled plausibly state a legal claim. And that's where I think the disconnect here is because they can't just say, maybe this could happen. They have to say, this is happening. Here's why. And it's notice pleading standards. So they don't need to say a ton, but they need to say this is in fact happening. I want to touch on two other quick points on preemption. Could you over time, sure. Well, let me just say two quick things. One is, counsel for the plaintiffs said that the Magnuson-Stevens Act is about sale, but could only point to the purposes of the act in some definitional sections. And that's because, as pointed out in our briefs, although I think it may be buried in a footnote, so I want to make clear, there are only two provisions in the Magnuson-Stevens Act that mention anything about sale. The federal government has no police powers. And so both of those provisions at 16 U.S.C. 1857 1G and U.S.C. 1853 B3, they allow, through fisheries management plans, the federal government to affect sales post-landing, post-processing, two ways. One is to restrict sales of fish parts taken, or fish taken in violation of the act. So a restriction in violation of the act. And the second one is to restrict sales if done in connection with the states through a fishery management plan. The only two authorizations for the federal government in any management plan existing or possible out there right now under this statute are to restrict sales. Other than that, this law stops at the point of landing and doesn't go beyond that. And lastly, counsel brought up for the first time NMA v. Harris, a preemption case that went up to the Supreme Court that is not contained in their briefing on appeal. And so I want to address that. That case was about an express preemption clause. So yes, it's a fact that in that case, California's ban on the sale and other practices relating to downed livestock, downed pigs, was found to be preempted. But that's because we're in a whole nother ballgame in terms of the federal regulatory scheme at issue. And I think if the court looks closely at that case, it will become apparent. That case is an express preemption case. And the preemption clause said, states can do nothing different than the federal government. They can't be more restrictive or more protective with respect to slaughterhouse premises. And so the fact that we have a conflict preemption argument. And here it's about, and not even that, it's the more nebulous sort of form of conflict preemption of obstacle preemption. Thank you. Thank you. Counsel, I ask you, is there anything in the pleading about the management plan? No, Your Honor. Other than to say that there is a management plan. And I think it's a little bit disingenuous for the defendant to get up here and say there's not a management plan when the defendant sits on the counsel that promulgates that management plan. So we can easily allege that. And what we're asking the court to do here is simply let us go back and allege in more full detail. How many times have you amended the complaint? Well, this complaint has been only challenged once. And we haven't had a chance to amend since the challenge. We amended voluntarily after it came up through a permanent injunction appeal because we had information from the federal government. And I want to address two things. Do you have new facts to allege? We do. Let me give you some right now. First of all. How many times has the complaint been amended? Once, voluntarily. And once again. And we're asking once is the answer. And the answer, once. Once, and it was voluntarily. Wasn't it amended once before the first proceeding? There was a complaint. We came up on a permanent injunction. We amended based on what the federal government said. We got a motion to dismiss. We didn't amend. The judge said you don't have leave to amend. And that's why we're here. Right. So I'm asking the question the judge asked, which is what new facts do you have to allege? And you were about to tell me. Yes, I am, Your Honor. First of all, about the fishery management plan. We can put in facts about that. For them to say that the fishery manage plan doesn't say anything about promoting fish or the number of fish that you take is silly. The optimum yield is the number of fish that will provide the greatest overall benefit to the nation, not just address California's things. Secondly, in the federal register just this year, well after the letter exchange, the love letter exchange with the NOAA, the federal register, the agency writes that there have been state bans on the possession, sale, and trade of shark fin. And it says there have also been many international efforts targeted shark fin soup. All of these efforts have impacted the market and demand for shark fins. And they've seen a steady decline in ex-vessel prices for shark fins in all regions. And they come up with an alternative, which is to allow more sharks to be taken out of the sea. We can allege that if the court will give us our one chance to amend, which has been a contested plea. The court dismissed your complaint without prejudice or without leave to amend? That's correct, Your Honor. And we agree to that as to the discrimination claim. For the equal protection claim, the trial judge asked, do you have any other facts about discrimination? That was the focus of the hearing, actually, if you count up the amount of minutes that he spent on it. And the trial counsel said, no, we don't. And we don't contest that. And you can save all that trouble in your brief of even having to address the equal protection claim. What don't you contest? I'm sorry, do you don't contest? We would ask leave to amend because we believe we have stated and can state. No, what you said you don't contest. Oh, sorry, what we don't contest. The equal protection claim, Your Honor. But you're still urging it, aren't you? No, I'm asking you to focus only on the preemption claim and the commerce clause. Oh, so you're abandoning the equal protection claim? Yes, Your Honor. I'm sorry, I didn't understand you. Yes, for purposes of facilitating this appeal because that was the case where the- For all purposes. Yes. Yeah, all right. No, that's fine. So down to the two claims. And at the hearing, was there any discussion about a leave to amend? No, there was only a question of counsel on the equal protection claim. Do you have any other facts other than these two straight comments? And counsel says, I don't have any in my back pocket. And the judge says, fine. Did your response to the motion to dismiss seek leave to amend? No, Your Honor. And this circuit has held that you don't even have to ask for leave to amend if the state could, if the complaint could, and you could allege. Well, no, I'm just trying to- But the answer is no. I'm trying to think this from the district judge's perspective. Did you- You never asked the district judge to give you leave to amend, did you? No. OK. No, that's correct. That's not fatal to our request for leave to amend now. But it is true that you could fault us and not the district court for not granting leave to amend. But in light of the additional information that wasn't alleged in the detail that the Humane Society would like, or that the state is asking for, we should be given leave to amend. And one important thing about the National Meat Association case, this was the defendant in that case, and our interveners were the amicus in that case. They actually were interveners in that case. They argued, that statute said nothing about sale. Go back and look at that statute, and please read Justice Kagan's opinion on that quote. It said nothing about sale. It only controlled the operations of a slaughterhouse. And what the Supreme Court said is, you can't come in here with a ban on sale and try to alter the operations of a slaughterhouse. The federal government has exclusive authority in that slaughterhouse to decide what they do with those animals. And you can't ban the resulting product. Same here. We just want the fish out of the EEZ. We want the shark fins that are landed lawfully, humanely, that are harvested so that the fishermen and the dealer and everyone else in the process does not have to treat these things like plutonium because the state has said so when the federal government is promoting and encouraging. And to address your question, Your Honor, there is a thing. There is a provision in the United States Code, in the Magnuson-Stevens Act. It says commercial fishing means fishing in which the fish harvested either in whole or in part are intended to enter commerce or enter commerce through sale, barter, or trade. That's what they're there for, to enter commerce through sale, barter, or trade, not to sit there on the dock where no one can touch them. Because under the California law, the fisherman arrives, cuts the fin off, and then what? No one can touch that fin. He's not even allowed to throw it away under California law. There's a state statute that prevents him from throwing away any part of the fish. So what happens? That's the direct conflict. That's why you don't need to worry about, is there some indirect effect in the degree of the effect, which we could allege. But you have a direct conflict here. If we're given leave to amend, we can allege those and bring those on summary judgment so the court has the benefit of the facts. Thank you, counsel. Thank you, Your Honor. Thank you all very much. Judge Noonan, did you have a question? I do not, thank you. Well, thank you all. The case is very well presented, and we'll take it under submission. The court will stand in recess for the afternoon. Court, for this session, stands adjourned.
judges: Reinhardt, Noonan, Hurwitz